UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DEALER SPECIALTIES, INC., *et al.*, | : | Case No. 1:15-cv-170 |
| | : | |
| Plaintiffs, | : | |
| | : | Judge Timothy S. Black |
| v. | : | |
| | : | |
| CAR DATA 24/7, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Doc. 32)**

This matter is before the Court on Plaintiffs Dealer Specialties, Inc. and Dealer Specialties International, Inc.'s Motion for Summary Judgment. (Doc. 32). Plaintiffs' motion was filed March 31, 2016. Defendants have not filed a response to date.[1] Plaintiffs' motion is accordingly ripe for consideration as unopposed.[2]

---

[1] Following Plaintiffs' filing of their motion for summary judgment, Defendants' counsel filed a motion to withdraw (Doc. 34), which was granted by the Court on May 3, 2016. (*See* 5/3/16 Notation Order). The Court then set a new deadline of June 17, 2016 for the parties to respond to the motion for summary judgment. (*Id.*). Notice of the motion was served upon the unrepresented defendants in accordance with Paragraph A.5 of the Court's Standing Order Governing Motions for Summary Judgment. (Docs. 37, 38, 40). To date, no response to the motion has been filed.

[2] Despite the lack of opposition, Plaintiffs are still required to demonstrate a genuine absence of material fact as to their claims to prevail on their motion for summary judgment. *See, e.g.*, *Miller v. Shore Fin, Servs. Inc.*, 141 F. App'x 417, 419 ("[The Sixth Circuit has] made it clear on many occasions that a district court abuses its discretion when it grants summary judgment solely because the non-moving party has failed to respond to the motion within the applicable time limit.") (citing *Stough v. Mayville Cmty. Sch.,* 138 F.3d 612, 614 (6th Cir.1998); *Carver v. Bunch,* 946 F.2d 451, 455 (6th Cir.1991)).

I.  UNDISPUTED FACTS

1. DS and DSI are in the vehicle data distribution and marketing business. DS's subsidiary, DSI, franchises to others a business system involving the production of unique vehicle description labels that facilitate vehicle sales along with the distribution of vehicle data, and the marketing and sale of certain products and services offered to vehicle dealers. Through its network of licensed franchises and other distribution channels, DSI provides automobile dealers with window stickers or labels comparable to those provided by manufacturers of new vehicles. (Doc. 32-3, at 1–2).

2. These labels are generated through the Autostik software. The Autostik software also transmits automobile data and photos related to the labels, which can then be used in the marketing and sale of vehicles on a variety of consumer websites and in printed publications. (*Id.* at 2).

3. On April 17, 2011, DSI, as franchisor, and Car Data 24/7, Inc. ("**Car Data 24/7**"), as franchisee, entered into a franchise agreement ("**Franchise Agreement**") for a non-exclusive franchise territory encompassing the Florida Counties of Broward, Miami-Dade, Monroe, and Palm Beach. (*Id.*; Doc. 19, at 11). The Franchise Agreement was a renewal of an existing franchise relationship between DSI on the one hand and Car Data 24/7 and Gary and Sherry Lindsey on the other hand. (Doc. 32-3, at 3).

4. Contemporaneously with entry into the Franchise Agreement, Gary Lindsey and Sherry Lindsey, as the owners of Car Data 24/7, gave their personal guaranty ("**Guaranty**") of payment and performance of each and every undertaking, agreement, and covenant of the Franchise Agreement. (*Id.* at 2).

5. Ten or more years ago, Gary and Sherry Lindsey began to involve their son, Ell Jay Lindsey, in the franchised business. Ell Jay Lindsey eventually assumed the title and duties of president of Car Data 24/7. (*Id.* at 3; Doc. 32-4 at 5–6).

6. Under the Franchise Agreement, Car Data 24/7 and, by their guaranty, Gary and Sherry Lindsey, promised that they would not own, engage or participate in a "Competing Business", which is defined as a business or enterprise that sells, markets or promotes products or services similar to those offered by Dealer Specialties® franchisees, including especially vehicle window labeling and vehicle data distribution. (Doc. 32-1, at 3). They further promised that during the term of the Franchise Agreement and for two years thereafter, they would not divert, or attempt to divert, any

2

customers of their Dealer Specialties® franchised business to any Competing Business by direct or indirect inducement or otherwise. (*Id.*).

7. Similarly, Ell Jay Lindsey entered into a Confidentiality/Non-Compete Agreement (the "**Non-Compete Agreement**") with DS and its subsidiaries and related business entities, including DSI. (*Id.*; Doc. 19, at 3; Doc. 32-4 at 9–10). Ell Jay Lindsey promised in the Non-Compete Agreement to keep confidential the information he learned by his access to the franchised business and promised not to provide services to any "Conflicting Organization", which is defined as any person or organization engaged (or about to become engaged) in the sale or service of "Conflicting Products", which is in turn defined as products or services similar or competitive with any Dealer Specialties® product. (Doc. 32-3, at 4).

8. During 2014, Car Data 24/7 began defaulting on its payment obligations under the Franchise Agreement. On February 3, 2015, DSI issued a formal notice of default ("**First Default Notice**"). (*Id.*; Doc. 32-4, at 7–8).

9. Within a few days of issuing the First Default Notice, DSI learned Defendants had been attempting to convert Dealer Specialties® customers to a different vehicle label and distribution system under a competitor's brand called HomeNet (Doc. 32-3, at 4):

    A. On November 25, 2014, Ell Jay Lindsey, as president of Car Data 24/7, entered into a Mutual Nondisclosure Agreement with HomeNet, Inc. for the purpose of "exploring a mutually beneficial relationship." (Doc. 32-4, at 34–36). The next day, Ell Jay Lindsey executed a Reseller Agreement with HomeNet, Inc. (*Id.* at 15, 37). Ell Jay Lindsey acknowledged that both HomeNet, Inc. and Dealer Specialties® are vehicle inventory platforms, offer essentially the same services, and he could not identify any difference between HomeNet and Dealer Specialties®. (*Id.* at 17–18).

    B. On February 9, 2015, Ell Jay Lindsey, using the e-mail address "elljaylindsey@cardata247.com" sent an e-mail to a Dealer Specialties® client notifying the client that "all of my guys are going to start utilizing HomeNet to upload our photographs. We will no longer be representing Dealer Specialties at the end of this week." (*Id.* at 38).

10. On February 13, 2015, DSI issued a second notice of default ("**Second Default Notice**") to Car Data 24/7, Gary Lindsey, Sherry Lindsey, and Ell Jay Lindsey, warning them that their conduct was in violation of the

3

restrictive covenants contained in the Franchise Agreement and Non-Compete Agreement. (Doc. 32-3, at 4–5).

11. Despite these warnings, Defendants refused to cease their competitive activities:

> A. On February 13, 2015, Plaintiffs received notification that Mercedes Benz of Cutler Bay, a Dealer Specialties® customer, intended to cancel its services and move to HomeNet as an inventory provider based on the relationship with Ell Jay Lindsey. (*Id.* at 5).

> B. Three days later, on February 16, 2015, Ell Jay Lindsey registered a new entity with the Florida Secretary of State under the name "Car Data, Inc." only to dissolve it on February 17, 2015. (*Id.* at 5–6; Doc. 32-4, at 39–42). On the same day (February 17, 2015), though, Ell Jay Lindsey's high school friend and "independent contractor" of Car Data 24/7, John Finucane, formed a new company called "CarData, Inc." (Doc. 32-3, at 5; Doc. 32-4, at 24).

12. On February 27, 2015, DSI terminated the Franchise Agreement based on Car Data 24/7's failure to satisfy its payment delinquency and also because Car Data 247 had been in default under the Franchise Agreement two or more times in the preceding twelve months. (Doc. 32-3, at 5).

13. DSI has maintained a corporate location and serviced customers in the same geographic area as Car Data 24/7 for more than a decade. Likewise, another Dealer Specialties® franchisee (Mark Piper) had an overlapping territory with Car Data 24/7 for many years. The Franchise Agreement expressly allowed these additional Dealer Specialties® presences:

> "B.   FRANCHISOR's grant of the franchise in the Territory is NON- EXCLUSIVE to its right to operate its own or affiliated Dealer Specialties® Business or grant franchises to other to do so."

(*Id.* at 6).

14. The South Florida area where the franchise territory is located is home to nearly 8 million people and hundreds of car dealerships and well beyond the capabilities of a single franchisee like Car Data 24/7. Still, DSI refrained from calling on customers with established relationships with Car Data 24/7 (or any other Dealer Specialties® franchisee) as it would be

4

confusing to the customer and not good for business in general. Plaintiffs never deployed a salesperson or sales team into the South Florida area to target Car Data 24/7's customers. (*Id.*).

15. Ell Jay Lindsey, though claiming generally that Plaintiffs "infringed" on the franchise territory, cannot provide any specific information on the alleged encroachment:

> *Q. And who was part of that sales force?*
> *A. I don't recall.*
> *. . .*
> *Q. And what dealerships were those?*
> *A. I don't recall.*

(Doc. 32-4, at 14).

> *Q. What dealerships did Dealer Specialties target?*
> *A. All of them.*
> *Q. But you don't remember the specific names of [] these dealerships?*
> *A. No.*
> *Q. What about the contact information for whoever you dealt with at the dealerships?*
> *A. No.*
> *Q. Which dealerships actually left Car Data 24/7?*
> *A. I don't recall.*
> *Q. Did any dealerships leave?*
> *A. I don't recall.*
> *. . .*
> *Q. Do you remember anything else about losing these dealerships?*
> *A. No.*
> *Q. What about the dates when the dealerships left Car Data 24/7?*
> *A. No.*
> *Q. Do you have any documents showing that Car Data 24/7 lost these dealerships to Dealer Specialties?*
> *A. No.*
> *Q. So you have no proof that you lost any business as a result of Dealer Specialties coming into your territory?*
> *A. No.*

(*Id.* at 21–23).

16. In fact, Defendants do not recall even the number of Dealer Specialties® clients they serviced prior to termination of the Franchise Agreement:

> *Q. How many dealerships did Car Data 24/7 service in 2015?*
> *A. I don't recall.*
> *Q. Does 90-100 sound right?*
> *A. I don't recall.*
> *Q. Is there any document that would refresh your recollection on this?*
> *A. Not that I know of.*

(*Id.* at 11).

17. Also, Defendants performed all of the services provided to their dealership clients on an informal basis:

    > *Q. Did you have contracts with any of these dealerships that we've talked about, Tech Auto Sales, Massey Yardley Chrysler, Toyota of South Florida, Dadeland Dodge?*
    > *A. No.*
    > *Q. No contracts at all?*
    > *A. No.*
    > *Q. Not written? Not oral?*
    > *A. No.*
    > *Q. And by you, I mean, Car Data 24/7 had no contracts --*
    > *A. No.*
    > *Q. -- with these dealerships? And you personally did not have any contracts with these dealerships?*
    > *A. Correct.*

    (*Id.* at 12).

18. Following the termination of the Franchise Agreement (that is, after February 27, 2015), Plaintiffs contacted the Dealer Specialties® customers formerly serviced by Defendants in an effort to salvage the customer relationships. (Doc. 32-3, at 6; Doc. 32-5, at 2).

19. On March 3, 2015, Plaintiffs sent a letter to the former customers of Car Data 24/7 notifying them that, despite Defendants' representations to the contrary, the customers did not need to change to a new vendor (such as HomeNet) to obtain Dealer Specialties®-type products and services. The letter also provided contact information and instructions for customers who wished to re-establish their Dealer Specialties® products and services. (Doc. 32-3, at 7).

20. On March 10, 2015, Brett Nicholson, Plaintiffs' National Sales Director, visited Lehman Hyundai Subaru. Ell Jay Lindsey arrived at the dealership while Mr. Nicholson was present, but the General Manager asked Ell Jay

6

        Lindsey to leave because he remained upset that Ell Jay Lindsey had transitioned the dealership from Dealer Specialties® to HomeNet without permission. (Doc. 32-5, at 2).

21. Similar to his encroachment claim, Ell Jay Lindsey cannot recall vital details about his claim that Plaintiffs defamed him:

    > *Q. Who made these statements?*
    > *A. No specific names. I don't have any specific names right now that I can think of.*
    > *Q. What about dates?*
    > *A. No specific dates.*
    > *. . .*
    > *Q. And were these statements verbal?*
    > *A. Yeah, verbal. Yeah. They're not going to put that on paper.*
    > *Q. So there were no statements in writing?*
    > *A. No. They're a billion-dollar company. They're not that dumb.*
    > *Q. What was the content of the statement? Exactly what they said?*
    > *A. Again, I wasn't there. They didn't say this to my face, so I don't know the exact. All I know is through the grapevine. So, you know, through several different sources that it was, you know, hey, you know, you're not doing business right away; you're about to get sued; you're about to be out of business, before any of this was true. Again, I don't have a problem with the statement. I have a problem with the time they did it.*
    > *Q. And who -- who was part of the grapevine?*
    > *A. I don't have any specific names.*

    (Doc. 32-4, at 28–29).

22. Despite Plaintiffs' efforts to regain their customers, Plaintiffs ultimately lost 79 Dealer Specialties® customers as a consequence of Defendants' violations of the restrictive covenants, and only five of the customers were ever recovered. (Doc. 32-3, at 7).

23. Plaintiffs initiated this action on March 11, 2015. (Doc. 1).

24. Plaintiffs served Car Data 24/7, Ell Jay Lindsey, Gary Lindsey, and Sherry Lindsey with the Complaint on March 16, 2015. (Docs. 5–8).

25. On April 18, 2015, the Court entered an Agreed Temporary Restraining Order enforcing the restrictive covenants of the Franchise Agreement and Non-Compete Agreement. (Doc. 13).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## III. ANALYSIS

Plaintiffs allege that Defendants violated the covenants to compete they entered as part of their previous business relationship, in which Car Data 24/7 was a franchisee of Dealer Specialties, Inc. The Complaint specifically accuses Defendant Ell Jay Lindsey, president of Car Data 24/7 Inc. and the son of the other individual defendants, of taking various actions to divert Dealer Specialties customers to competitor known as HomeNet. Plaintiffs' motion requests summary judgment on their claim for a permanent injunction enforcing the terms of the covenants not to compete.

### A. Breach of Contract

To prove a breach of contract under Ohio law, a party must prove four elements: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006).

#### 1. Existence of a valid contract

There are three contracts at issue in this case. The first is a franchising agreement between Plaintiffs and Defendant Car Data 24/7, Inc. signed by a representative of Plaintiffs and by Defendants Gary and Sherry Lindsey on June 6, 2011. (Doc. 1-1, at 1–32). Gary and Sherry Lindsey also signed a personal guaranty agreement making them personally liable under the franchise agreement. (*Id.* at 41). Pursuant to the agreement and guaranty, Defendants Car Data 24/7 Inc., Gary Lindsey and Sherry Lindsey promised that, for a period of two years following termination, "[d]ivert or attempt to divert, any business of, or any customers of, the Dealer Specialties® Business franchised hereunder, nor those of any other Dealer Specialties® franchise, or of [Plaintiffs'] affiliates, to any Competing Business, by direct or indirect inducement or otherwise . . . ." (*Id.* at 19). The franchise agreement also stated that the bound Defendants would not, for a period of two years following termination, own, engage, or participate in a competing business: (1) in Car Data 24/7, Inc.'s territory or within 20 miles of its territory. (2) in the territory or within 20 miles of the territory granted to another Dealer Specialties franchise, or (3) in the territory or within 20 miles of the territory in which Plaintiffs or their affiliates sell Dealer Specialties products or services.

9

The other contract at issue is a "Confidentiality/Non-Compete Agreement" signed by Defendant Ell Jay Lindsey, current president of 24/7 Inc. and son of Gary and Sherry Lindsey, on September 19, 2007. (Doc. 1-2). Pursuant to the non-compete agreement, Ell Jay Lindsey promised he would not, for a period of one year following termination of his access to the Dealer Specialties business system, directly or indirectly provide services to a competing business in connection with the sale, promotion, or distribution of any product or service that competes with any Dealer Specialties product or service. (*Id.* at 2). Furthermore, Ell Jay Lindsey promised he would not, for a period of one year following termination of his access to the Dealer Specialties business system, directly or indirectly solicit any Dealer Specialties clients he had contact with or whose account he serviced during his authorized use of Plaintiffs' business system. (*Id.*).

The restrictive covenants are reasonable, and Plaintiffs are entitled to enforce them. The covenants are supported by legitimate (and frequently recognized) business interests, including loss of control of reputation, loss of goodwill, and consumer confusion. *See Economou*, 756 F. Supp. at 1040. Here, Defendants had exposure to and training involving the Dealer Specialties® trade secrets and business model, considerable contact with Dealer Specialties® clients, and opportunities to develop industry relationships. *See Petland*, 2004 WL 3406089, at *3. Defendants plundered this information and used it to compete with Plaintiffs, which inevitably results in consumer confusion and leaves Plaintiffs' goodwill, tradename, reputation, prospective business opportunities, and proprietary information open to significant harm. *See Economou*, 756

10

F. Supp. at 1032; *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068, 1080 (Ohio Ct. App. 2001).

The Franchise Agreement makes clear the covenants not to compete are an integral aspect of DSI's franchising model, which further supports the reasonableness of the restrictive covenants and their enforcement. *See Petland*, 2004 WL 3406089, at *3; *Interstate Automatic Transmission Co. v. W.H. McApline*, 1981 WL 2193, at *2 (N.D. Ohio June 17, 1981). In particular, Car Data 24/7 acknowledged in the Franchise Agreement "it would be impossible after having received extensive training and consultation in the use of copyrighted software and the Dealer Specialties® System, to operate any Competing Business, without using some or all of [DSI's] trade secrets and information . . . or without disclosing . . . trade practices, secrets, methods of operation and copyrighted information." (Franchise Agreement at § XII(B)). Further, the Franchise Agreement required Car Data 24/7 to cause each of its employees to enter into and abide by a confidentiality and noncompetition agreement. (*Id.* at § XII(E)).

In addition to supporting legitimate business interests, the covenants contain appropriate spatial and temporal restrictions. The Franchise Agreement proscribes competitive conduct within any territory, or within twenty miles of any territory, already occupied by DSI or its franchisees. The Non-Compete Agreement proscribes competitive conduct in Car Data 24/7's territory and in any other geographic area where Ell Jay Lindsey had contact with Dealer Specialties® customers, or supervised Dealer Specialties® employees who had contact with customers, during the twelve months preceding termination of the Franchise Agreement. Courts in Ohio have upheld similar

11

and more expansive geographic restrictions. *See, e.g., Try Hours, Inc. v. Douville*, 985 N.E.2d 955 (Ohio Ct. App. 2013) (upholding nationwide covenant not to compete in expedited freight industry); *Am. Logistics Grp., Inc. v. Weinpert*, 2005 WL 2240987 (Ohio Ct. App. Sept. 15, 2005) (enforcing seventy-five mile geographic restriction in covenant not to compete); *Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 786 N.E.2d 914 (Ohio Ct. App. 2003) (enforcing covenant not to compete that spanned three counties); *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706 (S.D. Ohio 2006) (holding customer restrictions may substitute for a geographic restriction). Likewise, the two-year time period in the Franchise Agreement and one-year time period in the Non-Compete Agreement are reasonable. *Life Line Screening of Am., Ltd. v. Calger*, 145 Ohio Misc. 2d 6, 19 (2006) (collecting cases and observing "[n]umerous Ohio decisions have upheld contracts calling for two-year periods or longer"); *UZ Engineered Prods.*, 770 N.E.2d 1068 (enforcing two-year restrictive covenant in employment agreement); *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268 (Ohio Ct. App. 2000) (finding three-year non-compete with worldwide restriction was valid and enforceable).

### 2. Performance by Plaintiff

There is no genuine issue of material fact to dispute that Plaintiffs have performed their obligations under the contracts at issue in this case. In their amended Answer, Defendants claimed that Plaintiffs began sending sales people into the territory that had been granted to Defendants under the franchise agreement to undercut Defendants and directly sign client car dealerships. (Doc. 19, at 12). Defendants acknowledge that, per

12

the terms of the franchise agreement, Plaintiffs had the right to do this; however, they also claim that a verbal agreement between the parties gave Defendants exclusive rights to their territory, completely contrary to the written franchise agreement. (*Id.* at 11). Defendants also claim that Plaintiffs had published false and defamatory statements about Defendants to individuals including Defendants' clients. (*Id.* at 13).

However, none of Defendants' accusations regarding the Plaintiffs are supported by any evidence. During his deposition, Ell Jay Lindsey was asked about Plaintiffs' alleged breaches. Ell Jay Lindsey could not name any sales people who Plaintiffs had sent to Defendants' territory, could not name any dealership clients that had been lost as a result of Plaintiffs' alleged actions, could not name any individuals who defamed Defendants, could not identify when any defamatory statements were made, and could not even identify the individual who informed him about the defamatory statements, only being able to state that he heard it through the "grapevine." (Doc. 32-4, at 107–12). Conclusory accusations from Defendants' Answer without any supporting evidence will not defeat Plaintiffs' breach of contract claim at summary judgment.

Accordingly, Plaintiffs have demonstrated their own performance under their contract as is necessary to support their breach of contract claim.

### 3. Breach by Defendants

There is no genuine dispute that Ell Jay Lindsey, as president of Car Data 24/7 Inc., breached both contracts at issue in this case by exploiting his access to Plaintiffs' confidential information and using it to solicit Dealer Specialties customers. Months before the termination of the franchise agreement, Ell Jay Lindsey entered into a reseller

13

agreement with a company called HomeNet that he acknowledged provides the same types of services as those offered by Plaintiffs. (Doc. 32-4, at 12–13). He also used his e-mail address for the franchised business to contact Dealer Specialties clients to notify them of his switch to HomeNet and informed them that he was no longer representing Plaintiffs in Car Data 24/7's franchise territory. (*See id.* at 23). Without question, Ell Jay Lindsey's conduct violated his obligation not to "solicit any Clients of Dealer Specialties or its Franchisee(s) upon whom I called or with whom I had contact . . . ." (Non-Compete Agreement at § IV). Car Data 24/7 Inc.'s breach of its franchise agreement with Plaintiffs implicates Gary and Sherry Lindsey, as well, due to their status as guarantors.

Accordingly, Plaintiffs have demonstrated that Defendants breached both the franchise agreement signed by Car Data 24/7 Inc.'s guarantors and the non-compete agreement signed by Ell Jay Lindsey.

### 4. Damages

Plaintiffs allege that as a result of Defendants' breach of contract, Plaintiffs lost over 70 dealership customers. (Doc. 32-1. at 6). The record contains testimony from Ell Jay Lindsey that he wrote emails referencing his switching Plaintiffs' customers to competitors. (Doc. 32-4, at 23–24). The record also demonstrates that Plaintiffs have had to make overtures to former clients that were converted by Defendants in an attempt to regain their business. (Doc. 32-3, at 18).

Accordingly, Plaintiffs have demonstrated the damages element of their breach of contract claims. Because Plaintiffs have shown each element of their breach of contract

claims without any genuine dispute as to the material facts, summary judgment on Plaintiffs' breach of contract claims is warranted.

### B.     Defendant's Counterclaim

Plaintiffs' motion for summary judgment additionally requests summary judgment on Defendant Ell Jay Lindsey's counterclaim. The counterclaim alleges breach of contract claims against Plaintiffs. As discussed in Part III.A.2, *supra*, there is absolutely no evidence to support any breach of contract claim against Plaintiffs. Accordingly, summary judgment in favor of Plaintiffs is warranted.

### C.     Permanent Injunction

Plaintiffs' Complaint requests that the Court issue a permanent injunction preventing any of the Defendants from competing with Plaintiffs, providing services to any of Plaintiffs' competitors, or attempting to solicit or recruit any of Plaintiffs' employees. (Doc. 1, at 10-11). Plaintiffs request this injunction be imposed for one year. (*Id.*). The alleged basis for Plaintiffs' request is Defendants' breaching of the Franchise Agreement and Guaranty as well as the Non-Compete Agreement that the parties jointly entered into as part of their business relationship.[3]

A court considers four factors when considering whether a permanent injunction should issue: (1) whether the plaintiff has shown actual success on the merits; (2) whether the movant would suffer irreparable harm without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the

---

[3] The specific franchise agreement in question for purposes of this proceeding was actually a renewed franchise agreement, as the parties had been business partners for several years prior to this action. (Doc. 1, at 3).

public interest would be served by the injunction. *H.H. Franchising Sys., Inc. v. Aronson*, No. 1:12-cv-708, 2015 WL 401343, at *8 (S.D. Ohio Jan. 28, 2015); *see also ACLU of Ky. V. McCreary Cty.*, 607 F.3d 439, 445 (6th Cir. 2010) (recognizing the standard for a permanent injunction is essentially the same as that for a preliminary injunction except that a plaintiff must prove actual success on the merits rather than a likelihood of success on the merits).

### 1. Success on the merits

As this Court has already discussed in Part III.A, *supra*, summary judgment in Plaintiffs' favor is appropriate as to their breach of contract claims.  Accordingly, this factor weighs in favor of granting the permanent injunction.

### 2. Plaintiffs' irreparable harm

Plaintiffs have demonstrated that they would suffer irreparable harm should injunctive relief not be granted.  Evidence in the record indicates that Plaintiffs have already lost several customers as a result of Defendants' violation of the non-compete agreements they signed.  Even though Plaintiffs have since made overtures to their lost clients, the vast majority of those lost through Defendants' breach have not returned. Allowing Defendants to continue to convert Plaintiffs' clients in violation of the non-compete agreements in place would exacerbate the irreparable harm already done to Plaintiffs.

Accordingly, this factor weighs in favor of granting Plaintiff permanent injunctive relief.

### 3. Substantial harm to others/public interest

The injunctive relief requested by Plaintiffs will not bring any harm to third parties. The only injunctive relief requested is for Defendants to be held to the terms of their non-compete agreements with Plaintiffs for one year. Further, to the extent the public has an interest at all, it is in seeing that reasonable restrictive covenants are preserved and enforced. *Id.*; *Bierdeman* 786 N.E.2d at 920 ("Preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest."). While Defendants may argue that granting this relief would harm their business, Defendants may not benefit from their breach of contract.

Accordingly, this factor weighs in favor of granting Plaintiffs' requested permanent injunction. Because all of the relevant factors are in Plaintiffs' favor, Plaintiffs' request for a permanent injunction is granted.

### IV. CONCLUSION

Accordingly, for the reasons outlined above, Plaintiffs' motion for summary judgment (Doc. 32) is **GRANTED.**

1. Plaintiffs' breach of contract claim against Defendant Ell Jay Lindsey is **GRANTED** as to liability;[4]

2. Defendant Ell Jay Lindsey's Counterclaim against Plaintiffs is **DENIED**;

3. Defendants Car Data 24/7 Inc., Gary Lindsey, and Sherry Lindsey, along with their agents, servants, employees, and those in active concert or participation with them, are hereby **RESTRAINED AND ENJOINED** from:

---

[4] Plaintiffs have also succeeded on the merits of their claim for injunctive relief against Ell Jay Linsdey, but the period of time requested for the injunction has already expired. Accordingly, that request is now moot.

17

  A. Owning, maintaining, engaging in, or participating in the operation of any competing business within: (1) Car Data 24/7's territory or within twenty miles of its territory, (2) in the territory, or within twenty miles of the territory, granted to any other Dealer Specialties® franchise, or (3) in the territory, or within twenty miles of any territory, in which DSI or its affiliate offers and sells Dealer Specialties® products or services; or

  B. Diverting, or attempting to divert, any business of, or any customers of the Car Data 24/7 franchise, any other Dealer Specialties franchise, or DSI's affiliate, to any competing business, by direct or indirect inducement or otherwise;

until April 8, 2016.

  **IT IS SO ORDERED**.

Date:  9/23/16                   *s/ Timothy S. Black*
                               Timothy S. Black
                               United States District Judge